Citation Nr: 1714072 
Decision Date: 04/28/17 Archive Date: 05/05/17

DOCKET NO. 10-00 399A ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Louisville, Kentucky


THE ISSUES

1. Whether new and material evidence has been received to reopen a claim of service connection for a right wrist, hand, or thumb disability.

2. Entitlement to service connection for a right wrist, hand, or thumb disability.

3. Entitlement to increased ratings for service-connected posttraumatic stress disorder (PTSD), currently assigned "staged" ratings of 10 percent prior to April 10, 2007, 30 percent from April 10, 2007 to August 15, 2007, and 50 percent from August 15, 2007.


REPRESENTATION

Appellant represented by: The American Legion



ATTORNEY FOR THE BOARD

M. Yuan, Associate Counsel


INTRODUCTION

The appellant is a Veteran who served on active duty from August 1982 to August 1992 and from February 2003 to August 2003. These matters are before the Board of Veterans' Appeals (Board) on appeal from a November 2007 rating decision of the Louisville, Kentucky Department of Veteran Affairs (VA) Regional Office (RO) that, in pertinent part, continued a 30 percent rating for PTSD. This appeal was previously remanded in November 2013 by another Veterans Law Judge (VLJ); it is now before the undersigned.

A brief procedural history is warranted with respect to this appeal. The Board notes that a July 2007 rating decision granted the Veteran a 30 percent rating for PTSD from April 10, 2007. The Veteran timely appealed that decision (among others addressed in the July 2007 decision) by filing an August 2007 notice of disagreement (NOD). In response, a statement of the case (SOC) was issued later that month. In September 2007, the Veteran both filed a withdrawal of his PTSD claim and sought to file a claim for increased rating for the same disability. Thus, the Board considers the initial withdrawal essentially revoked. Unfortunately, however, a substantive appeal was not received perfecting the PTSD appeal (or any others addressed in the August 2008 SOC); therefore, that appeal lapsed. Notably, the September 2007 claim also sought to reopen a previously denied claim of service connection for a right wrist disability. A November 2007 rating decision continued a 30 percent rating for PTSD and declined to reopen service connection for a right wrist disability. In January 2008, the Veteran filed a "new claim" seeking an increased rating for PTSD and to reopen service connection for a right wrist disability. As this was received within one year of the November 2007 decision and clearly implies disagreement with the substance of that decision, the Board will liberally construe it as a NOD. Therefore, the decision currently on appeal is from November 2007. Moreover, the issue has been recharacterized (as above) to reflect consideration of several "staged" ratings in effect during the period on appeal. 

The issue of service connection for a right wrist disability on de novo review is addressed in the REMAND portion of the decision below and is REMANDED to the Agency of Original Jurisdiction (AOJ).


FINDINGS OF FACT

1. An unappealed September 2004 rating decision originally denied the Veteran service connection for a right thumb or hand disability based essentially on a finding that a current disability was not shown; an unappealed March 2007 rating decision declined to reopen that claim because new and material evidence was not received.

2. Evidence received since the March 2007 rating decision includes evidence not of record at that time that suggests the Veteran has a right wrist or hand disability; relates to an unestablished fact necessary to substantiate the underlying claim of service connection; and raises a reasonable possibility of substantiating that claim.
 
3. From September 26, 2006, the evidence reasonably shows the Veteran's PTSD produced symptoms such as chronic sleep impairment and depression that caused occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, though generally functioning satisfactorily, with routine behavior, self-care, and conversation normal.

4. From July 2, 2007 (but not earlier), the Veteran's PTSD is reasonably shown to have produced symptoms of a frequency, severity, and duration consistent with occupational and social impairment with deficiencies in most areas, such as work, family relations, judgment, and mood.

5. At no point during any period on appeal is the Veteran's PTSD shown to produce symptoms of a frequency, severity, and duration consistent with total occupational and social impairment.


CONCLUSIONS OF LAW

1. New and material evidence has been received; the claim of service connection for right wrist disability may be reopened. 38 U.S.C.A. §§ 5108, 7105 (West 2014); 38 C.F.R. § 3.156 (2016).

2. From September 26, 2006, a 30 percent rating (but not higher) is warranted for service-connected PTSD. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 4.1, 4.130, Diagnostic Code (Code) 9411 (2016).

3. From July 7, 2007, a 70 percent rating (but not higher) is warranted for service-connected PTSD. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 4.1, 4.130, Diagnostic Code (Code) 9411 (2016).


REASONS AND BASES FOR FINDINGS AND CONCLUSION

The Veterans Claims Assistance Act of 2000 (VCAA)

Inasmuch as this decision reopens the claim of service connection for a right wrist disability and remands the downstream service connection claim, there is no reason to belabor the impact of the VCAA on the matter; any notice or duty to assist omission is harmless.

Regardless, VA's duty to notify was satisfied by letters dated in October 2007, January 2008, September 2008, and November 2008. While the Board acknowledges that several of these letters were sent after the November 2007 rating decision on appeal, the initial timing defect was cured by subsequent letters providing the requisite notice and readjudication of the matter in the December 2009 SOC. See Mayfield v. Nicholson, 444 F.3d 1328, 1334 (Fed. Cir. 2006). Critically, the Veteran has had ample opportunity to respond and has not alleged that notice was less than adequate. See 38 U.S.C.A. §§ 5102, 5103, 5103A (West 2014); 38 C.F.R. § 3.159 (2015); see also Scott v. McDonald, 789 F.3d 1375 (Fed. Cir. 2015). 

In addition, the Veteran's service treatment records (STRs) and pertinent postservice treatment records have been obtained. In November 2013, the Board remanded this appeal to arrange for a hearing before the Board. However, the Veteran subsequently withdrew his hearing request by February and April 2016 correspondence. The Board finds the November 2013 remand has been substantially complied with. The record includes reports of September 2006, June 2007, February 2008, November 2009, June 2010, August 2010, January 2012, and May 2016 VA examinations that, together, reflect consideration of the relevant medical history and describe the Veteran's psychiatric disability in sufficient detail to allow for application of the applicable rating criteria. Notably, the Veteran has not alleged that his PTSD has worsened since the most recent VA examination. He has also not identified any pertinent evidence that remains outstanding. Therefore, VA's duty to assist is met. 

Legal Criteria, Factual Background, and Analysis

The Board notes that it has reviewed all of the evidence in the record. Although the Board has an obligation to provide reasons and bases supporting its decision, there is no need to discuss every piece of evidence. Gonzales v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000). Hence, the Board will summarize the relevant evidence as deemed appropriate, and the Board's analysis will focus specifically on what the evidence shows, or fails to show, as to the claims.


Claim to Reopen

Generally, when a claim is disallowed, it may not be reopened and allowed, and a claim based on the same factual basis may not be considered. 38 U.S.C.A. § 7105. However, a claim on which there is a final decision may be reopened if new and material evidence is submitted. 38 U.S.C.A. § 5108. "New" evidence means existing evidence not previously submitted to agency decision-makers. "Material" evidence means existing evidence that, by itself or when considered with previous evidence of record, relates to an unestablished fact necessary to substantiate the claim. New and material evidence can be neither cumulative nor redundant of the evidence of record at the time of the last prior final denial of the claim sought to be reopened, and must raise a reasonable possibility of substantiating the claim. 38 C.F.R. § 3.156(a). When determining whether the claim should be reopened, the credibility of the newly submitted evidence is to be presumed. Fortuck v. Principi, 17 Vet. App. 173, 179-80 (2003).

The requirement of new and material evidence raising a reasonable possibility of substantiating the claim is a low threshold. Specifically, the language of 38 C.F.R. § 3.156(a) creates a low threshold and the phrase "raises a reasonable possibility of substantiating the claim" should be viewed as "enabling rather than precluding reopening." See Shade v. Shinseki, 24 Vet. App. 110 (2010).

To substantiate a claim of service connection, there must be evidence of: a current claimed disability; incurrence or aggravation of a disease or injury in service; and a nexus between the disease or injury in service and the current disability. See Shedden v. Principi, 381 F.3d 1153, 1166-1167 (Fed. Cir. 2004). The determination as to whether these requirements are met is based on an analysis of all the evidence of record and the evaluation of its credibility and probative value. Baldwin v. West, 13 Vet. App. 1 (1999); 38 C.F.R. § 3.303(a). 

When there is an approximate balance of positive and negative evidence regarding the merits of an issue material to the determination of the matter, the benefit of the doubt in resolving each such issue shall be given to the claimant. 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102. When all of the evidence is assembled, VA is responsible for determining whether the evidence supports the claim or is in relative equipoise, with the Veteran prevailing in either event, or whether a fair preponderance of the evidence is against the claim, in which case the claim is denied. Gilbert v. Derwinski, 1 Vet. App. 49, 55 (1990). 

Here, the Veteran was initially denied service connection for a right thumb or hand disability in September 2004. At that time, he claimed that such disability was related to a right hand fracture in service. The September 2004 rating decision found that, despite evidence of a right thumb sprain in service, there was no evidence of a current disability. The Veteran was notified of that decision and his appellate rights, but did not initiate a timely appeal. Thus, that decision became final.

Thereafter, the Veteran sought to reopen that claim, and added that he tripped over a rope and landed on his wrist while on patrol. A March 2007 rating decision declined to reopen service connection for a right hand or thumb disability because new and material evidence relating to the presence of a current disability had not been received. The Veteran did timely appeal this decision by filing an April 2007 NOD. However, after an August 2007 SOC was issued addressing that matter, he filed a September 2008 withdrawal of that appeal. Consequently, the March 2007 rating decision also became final based on the evidence then of record, and is the prior final denial in this appeal.

Evidence in the record at the time of the March 2007 rating decision included STRs (showing an injury to the right hand in June 2003), lay statements (alleging a right thumb, hand, or wrist disability related to an injury from falling over a rope in Kuwait), and VA treatment records (that were silent for a diagnosis for right thumb, wrist, or hand disability). 

Evidence received since the March 2007 rating decision includes, among other documents, updated VA treatment records that reflect current diagnoses for right wrist or hand disabilities, including tenosynovitis, right wrist ganglion cyst, and degenerative joint disease (DJD) or osteoarthritis. Because the March 2007 rating decision specifically declined to reopen the underlying claim because there was no evidence tending to show a current diagnosis, such evidence directly relates to previously unestablished elements of service connection needed to substantiate the Veteran's claim. Moreover, the Veteran continues to allege that such disability is related to a right wrist, hand, or thumb injury in service which STRs already confirm and prior rating decisions have found to be established. In light of the above, and particularly considering the low threshold for reopening established in Shade, the Board finds that the new evidence also raises a reasonable possibility of substantiating the underlying service connection claim. Therefore, it is both new and material, and the claim of service connection for a right wrist disability may be reopened. The downstream issue of service connection on de novo review will be discussed in the remand portion below.

Increased Rating for PTSD

Disability ratings are assigned in accordance with VA's Schedule for Rating Disabilities and are intended to represent the average impairment of earning capacity resulting from a disability. See 38 U.S.C.A. § 1155; 38 C.F.R. §§ 3.321(a), 4.1. When a question arises as to which of two ratings shall be applied under a particular diagnostic code, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for the higher rating; otherwise, the lower rating will be assigned. See 38 C.F.R. § 4.7.

In a claim for increase the present level of disability is the primary concern. Francisco v. Brown, 7 Vet. App. 55, 58 (1994). However, where the evidence contains factual findings that demonstrate distinct time periods when the service connected disability exhibited diverse symptoms meeting the criteria for different ratings during the course of the appeal, staged ratings are to be considered. See Hart v. Mansfield, 21 Vet. App. 505 (2007). The relevant temporal focus for adjudicating the level of disability of an increased rating claim begins one year before the claim was filed. As the instant claim for increase was received on September 26, 2007, the period for consideration is from September 26, 2006 to the present.

The Veteran's PTSD is rated according to the General Rating Formula for Mental Disorders. Under the relevant rating criteria, a 10 percent rating is warranted for occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or symptoms controlled by continuous medication. A 30 percent rating is warranted for occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events). 38 C.F.R. § 4.130.

A 50 percent rating is warranted for occupational and social impairment with reduced reliability and productivity. This may be due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships. Id.

A 70 percent rating is warranted for occupational and social impairment, with deficiencies in most areas (such as work, school, family relations, judgment, thinking, or mood). This may be due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work-like setting); inability to establish and maintain effective relationships. Id.

A 100 percent rating is warranted for total occupational and social impairment. This may be due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name. Id.

The symptoms listed in VA's general rating formula for mental disorders are not intended to constitute an exhaustive list, but rather are to serve as examples of the type and degree of the symptoms, or their effects, that would justify a particular rating. Mauerhan v. Principi, 16 Vet. App. 436 (2002). The Board is precluded from differentiating between symptoms attributable to PTSD and those associated with nonservice-connected mental health disorders absent clinical evidence clearly showing such distinction. See Mittleider v. West, 11 Vet. App. 181, 182 (1998). 

According to the applicable rating criteria, when evaluating a mental disorder, the frequency, severity, and duration of psychiatric symptoms, the length of remissions, and the Veteran's capacity for adjustment during periods of remission must be considered. 38 C.F.R. § 4.126(a). In addition, the evaluation must be based on all the evidence of record that bears on occupational and social impairment rather than solely on the examiner's assessment of the level of disability at the moment of the examination. Id. Further, when evaluating the level of disability from a mental disorder, the extent of social impairment is considered, but the rating cannot be assigned solely on the basis of social impairment. 38 C.F.R. § 4.126(b).

 Rating Prior to April 10, 2007

The Veteran is currently rated 10 percent prior to April 10, 2007. Thus, the Board will first consider whether a higher rating is warranted for that period. 

The only evidence directly bearing on the severity of his PTSD during this time is a September 2006 VA examination report. At that time, the Veteran said he had recollections of war that interfered with his sleep and sometimes drove him to leave work early due to aggravation. He said his wife told him he has "an angry attitude" and that he wakes her up with his nightmares. These symptoms were said to occur daily and nightly. He said he had no friends and did not go out much. He denied any history of assault or suicide attempt. The examiner found no impairment of thought processes or communication. The Veteran denied hallucinations or delusions. He made good eye contact, was well-oriented, and did not complain of memory loss. Speech was relevant, logical, quiet, and thoughtful, indicating an overall sense of "intact sensorium and good cognitive skills." He did not complain of panic attacks, but described moderate depression. The examiner noted he had been prescribed an antidepressant as of July 2006. The diagnosis was PTSD. 

The report shows the Veteran's PTSD already produced daily sleep impairment, moderate depression requiring medication, and at least some impact on his work (insofar as PTSD symptoms caused him to leave work early). Moreover, May 2007 VA treatment records (just after the period under consideration) confirm that he continued to have sleep difficulties due, at least in part, to traumatic nightmares as well as depression. Under the circumstances, the Board finds that the Veteran's PTSD symptoms included problems expressly contemplated by the criteria for a higher 30 percent rating. Moreover, it is certainly fair to characterize his leaving work prematurely at times as "occasional decrease in work efficiency" and certainly his absence caused "intermittent periods of inability to perform occupational tasks." As this examination was conducted just prior to the beginning of the period on appeal, the Board finds the evidence is at least in relative equipoise as to whether it an increase in severity consistent with a 30 percent rating is factually ascertainable in the year prior to the date of claim. Consequently, a 30 percent rating is warranted from September 26, 2006.

 Ratings for Remaining Periods on Appeal 

Thus, the Veteran's PTSD is now rated 30 percent from September 26, 2006, and 50 percent from August 15, 2007. The next question is whether a rating in excess of 30 percent is warranted prior to August 15, 2007, and whether a rating in excess of 50 percent is warranted from that date.

Factual Background

May 2007 VA treatment records show the Veteran was oriented to person, place, time, and situation. He reported sleeping only four to five hours a night, with nightmares. He said he felt depressed. The diagnosis was PTSD. 

On June 2007 VA examination, the Veteran said he was in his second marriage and had been married for a year. He had a son from a former marriage as well as two nonbiological children from his wife's former marriage. He indicated he was working for Bank of America as a customer service representative. He reported irritability, less than two hours of sleep a night, and social withdrawal (according to his wife). He indicated he slept with "one eye open" and had a hard time adjusting to civilian life. The examiner indicated the Veteran said he would reenlist if he could, suggesting "less than a felicitous domestic life." The Veteran said he jumped at every sound. He indicated his symptoms caused him to become "real irritable with customers" and that he had lost time from work due to PTSD about ten times in the prior three months. His marital relationship was reportedly "shaky" and he did not talk to his biological brother. He had no friends and said he essentially only went out to attend church. He reported few leisure pursuits outside watching television and tried to avoid interaction with his family. He denied any history of violence, assault, suicide attempts, suicidal or homicidal thoughts, impairment of thought processes or communication, delusions, or hallucinations. The examiner also noted that the Veteran maintained good eye contact, had excellent hygiene, was well oriented, and did not report memory loss or impairment. There were no complaints of obsessive or ritualistic behavior, and speech was soft in volume and force. However, his intonation was normal and indicated understanding of the conversation. He did not report panic attacks, but did say his "depression has increased." He denied impaired impulse control but said he could not sleep more than two and a half hours and described himself as "moody." The diagnosis was PTSD, mild to moderate.

A July 2007 statement from a friend indicates the Veteran's wife often complained about his PTSD, and that he always seemed to be in a depressed mood. In a separate statement that month, the Veteran's wife attested to his lack of sleep (roughly three hours a night), constant nightmares, and intrusive memories. She said he wakes at times crying and scared, and had panic attacks at night. She described him as depressed, and noted he had been so for a long time. His mood was reportedly always argumentative and he apparently almost lost his job because he did not want to go to work. She said his flattened mood put a "damper on our relationship" and that they were contemplating divorce. He could not communicate at times with her or other family members. 

In December 2007, VA records note frequent intrusive thoughts and nightmares, hypervigilance to noises in his environment, exaggerated startle response, and feeling a compulsion to check his doors several times a night. On mental status examination, he was awake, alert, cooperative, and made good eye contact. He was also well-groomed, professionally attired, and spoke with a normal rate, volume, and tone. His mood was irritable with a constricted but appropriate affect. Thought processes were linear and goal-directed. Thought content was free from suicidal or homicidal ideation or hallucinations. Insight and judgment were fair. A January 2008 Vet Center intake evaluation indicates the Veteran was neat, friendly, cooperative, and of average intelligence. Speech was appropriate and he was well-oriented. However, memory was impaired, and he had tense, agitated, and restless motor activity. Affect was appropriate and judgment was fair. There was no evidence of delusion, disorganized thinking, or hallucinations. He reported sleep disturbance and a decrease in sex drive due to difficulty being intimate. His energy level was low. He reported some suicidal thoughts, but denied any homicidal thoughts. 

In a January 2008 statement, the Veteran said he was having bad dreams and memories of traumatic events in service. He experienced "intense distress all of the time." His heart was always pounding and he reported sleep disturbances that required a change in medication. He also said his PTSD was causing him to forget peoples' names and other things. He was reportedly constantly fighting with his wife and his mood was "always bad." He also felt angry all the time, and endorsed continuous panic. As a result, he missed days from work. He also reported inexplicable periods of violence with friends and family.

February 2008 VA records document reports of continued irritability at home and work that at times forced him to walk away from customers to catch his breath. He also continued to report impaired sleep and hypervigilance. He denied suicidal or homicidal thoughts, plans, or intent. On mental status examination, he was awake, alert, and cooperative, with good eye contact. He was well-groomed and had no abnormal psychomotor activity. Speech was normal. However, he had a constricted, albeit appropriate, affect. His mood was unchanged, and thought processes were linear and goal-directed. Insight and judgment were fair, and the Veteran denied any hallucinations. 

On February 2008 VA examination, the Veteran "interacted in a mildly surly, at times bordering on hostile manner, but for the most part he was cooperative with the examination." He said he tried to finish college after service but performed poorly in classes and "ended up giving up." He then divorced his first wife, and moved to South Carolina. He reported difficulties holding a job since service, noting he had worked in a number of fields, including car sales, life insurance sales, and real estate. For the prior two years, he had been working in customer service at a bank, but did not like the job and planned to quit soon. He said he had a 17 year old son from his first marriage but seldom interacted with him. He also reported that he did not have a close relationship with his own father. He reported difficulty sleeping and felt "on guard" at night. He was living with his second wife, with whom he did not have a good relationship, and stepdaughters. He noted being "frequently irritable with the children." He seldom socialized over the prior 20 years and said he did not attend church. The examiner noted that the Veteran did not appear to be in any acute distress, and was alert and well-oriented. He was able to express himself relevantly and coherently, but "simply refused to attempt" some mental status tasks requiring problem solving and concentration, "although they appeared to be within his ability level." He could not name George Bush as the President of the United States, but recalled all three words presented on testing after presentation and one of three after delay. He failed to spell the word "world" correctly forwards or backwards, and could not solve mental computational tasks. Verbal comprehension and abstracting ability could not be estimated because he refused to participate in the tasks. The examiner noted that he "seemed to regard the mental status exercise as something of a demand, and his response was to make a show of defiance, as if he could not be 'pushed around.'" This was felt to be "consistent with his own self report that he was regarded as having an 'attitude problem' in the military, and that he was passed over for promotion and ultimately denied the opportunity to re-enlist." The Veteran said he avoided large crowds or watching news on television. He did not get along well with other people, but he denied any current or recent homicidal or suicidal ideation. He reported past episodes of heavy drinking, but denied drinking to the point where intoxication caused social, health, or occupational problems. By his own report, the examiner noted he had some social adjustment problems prior to service and never had close friends. He also reported anxiety attacks, headaches, and occasional rumination about his military experiences. The examiner felt his social unease was very apparent during the interview and he lacked social skills, projecting an air of hostility and belligerence. The diagnosis was PTSD with possible personality disorder not otherwise specified (NOS). 

In May 2008, the Veteran endorsed feelings of hopelessness and thoughts of suicide. He continued to endorse sleepless nights. Later that month, the Veteran was awake, alert, and cooperative. He made good eye contact, was well groomed, and had no abnormal psychomotor activity. Speech was normal and mood was anxious, but with appropriate affect. Thought processes were linear and goal-directed, and he denied any suicidal or homicidal ideation or hallucinations. Insight and judgment were fair. However, he remained isolated, was unable to think of the future, and had no activity outside of work. 

A September 2008 statement from a friend indicates the Veteran reacts strongly to loud noises or gunfire and sometimes believes he is still in Iraq. She indicated he "separated himself from his family, and seems to have no communication with them." She also felt he had difficulty keeping jobs because of his difficulty adapting to work settings and the fact that "people seem to bother him." She also noticed that "little things make him very irritable, for no reason." The Veteran's wife had also told the writer that he hardly ever slept because he is always on guard and had dreams about combat. The Veteran's mood was also apparently always depressed, and he had no friends "because he has a hard time maintaining relationships with them." 

In October 2008, the Veteran's sister-in-law attested to an increase in his alcohol use as well as mood swings. She said he seemed very depressed and often had panic attacks "for no apparent reason." She indicated it was "very apparent" to her that "something is really wrong with him," noting that he was a loner who had never had friends and hardly even communicated with his family. A subsequent statement from a friend indicates the Veteran could not stand being around people and was affected by any loud banging noises. In addition, he apparently had quite a temper and argued with his wife constantly. The statement also notes that he had "forgotten about his family." Furthermore, the Veteran reportedly had difficulty concentrating and was emotionally numb. 

The Veteran's wife also submitted another October 2008 statement indicating he no longer became excited or happy about anything and rarely showed any emotion besides anger. She indicated that he was either nonresponsive or dismissive when she tried to discuss important issues with him and said he did not sleep through the night (with only three hours of estimated sleep per night). Even when he did go to bed, it would be reluctantly and only with encouragement. He apparently jumped at any noise through the night and said he did not feel safe. She also said that he had hit her in his sleep on several occasions and had trouble remembering things, including his aunts' and uncles' names or important events. At first, she believed that he was hiding things from her but realized that he simply could not remember things "that should be unforgettable." She also said he had no close friends or family members that he spoke with, and was withdrawing more and more.

An October 2008 VA treatment record notes the Veteran had been recently fired by Bank of America and was briefly unemployed, but had secured another job at Sprint as a manager. However, he did not want that role or to be responsible for anything. Ideally, he wanted to work in a warehouse and not be in charge of anyone but himself. He agreed that this was a low aspiration and below his education. He continued to report continued nightmares three times a week and intrusive thoughts. He denied any activity outside of work and had not been to church in three months. He denied suicidal or homicidal thoughts, plans, or intent. He said he did not feel comfortable leaving work after dark and that he checked the locks three or four times a night. He said he was argumentative with his wife as well as detached and emotionally flat with his family. On mental status examination, he was well groomed and appeared his stated age. His behavior was guarded, but he made good eye contact and had no abnormal psychomotor activity. Speech lacked spontaneity, but was of normal volume. His mood was "alright" and affect was flat. He denied hallucinations or delusions, and thought processes were goal-directed. Memory and orientation were impaired-the provider noted he missed two out of three recall items and could not perform serial seven tests, but could complete the word "world" backwards accurately. He named 13 (out of at least 15 expected) animals in one minute and could not name the three most recent Presidents. However, he appeared to have made a good effort. His insight and judgment were also impaired. The diagnosis was prolonged PTSD.

In December 2008, the Veteran said "all I think about is suicide now." He also indicated he was easily aggravated by people and always felt depressed. He said he could not seem to maintain suitable employment, noting he was on his fifth job of the year. He described having no motivation in life, and said he hallucinated about being in combat at times and seeing dead Iraqis. 

A May 2009 VA record indicates that the Veteran's relationship with his wife had deteriorated to the point that most conversations were arguments. He indicated that he was more hypervigilant, particularly at night, and had increased nightmares with continued difficulty falling asleep. The Veteran said he would, unbeknownst to his wife, go to a friend's house several nights a week to drink beer. He was not engaged in any activities with his children. At the time, he was working in a customer service position and did not enjoy it, finding himself increasingly irritable with customers. He said he had a degree in organizational management and was looking for a desk job with minimal consumer interaction. He denied suicidal ideation, thoughts, or plans. On mental status examination, he was well groomed and appeared his stated age. His behavior was guarded but he made good eye contact, and there was no sign of abnormal psychomotor activity. Speech lacked spontaneity but was normal in volume. His mood was "depressed now and then" and affect was flat. Thoughts were free from suicidal or homicidal ideation, or perceptual abnormalities (i.e., hallucinations or delusions). Thought processes were goal-directed, memory and orientation were grossly intact, and insight and judgment were impaired.

A June 2009 statement from a friend indicates the Veteran came home from his deployment with "anger for life" that had progressively worsened. He and his wife were apparently constantly having marital problems because of the anxiety and stress, and he had lost at least four jobs in the prior two years. This was accompanied by a depressed state and excessive mood swings. 

In July 2009, the Veteran said he felt tired, with low energy and interest in activities. He reported no activity after returning home and little motivation. He said he was short-tempered, which was negatively impacting his work as a salesman with Sprint. He also reported hopeless feelings with respect to his job search, but denied any suicidal or homicidal thoughts, plans, or intent. On mental status examination, he was well groomed, guarded, and made good eye contact. There was no abnormal psychomotor activity and speech was of normal volume (though it lacked spontaneity). He was depressed now and then, and had a flat affect. Thought content was free from suicidal or homicidal ideation, hallucinations, or delusions. Thought processes were goal-directed and memory was grossly intact, but insight and judgment were impaired. Subsequent November 2009 VA records show the Veteran reported increased memories of combat in Kuwait, agitation, and irritability. He had just been fired a week earlier and felt that having time on his hands contributed to an increase in symptoms. He was feeling down and hopeless, and said his termination was related to a lack of focus and follow-through at work. He was concerned about the financial implications of being denied unemployment assistance as he continued to look for a new job. He also had separated from his wife, though they were still living together until he found a new place to stay. He was vague about thoughts of being dead, but denied any specific suicidal or homicidal thoughts. Sleep remained poor with difficulty falling asleep and awakenings. On mental status examination, he was well groomed and guarded, but made good eye contact. There was no abnormal psychomotor activity. He did not volunteer information, but speech was normal in tone and soft in volume. Mood was "down" and "more irritable" with severely restricted affect. Thoughts were free from hallucinations or delusions and goal-directed. Insight and judgment were impaired. 

On November 2009 VA examination, the Veteran said he was preparing for a legal separation from his second wife after three years of marriage. She had refused to attend the appointment with him because she had "no hope for their relationship." They had reportedly moved apart from one another three months prior. He said his marriage had been close to physical violence on several occasions, and his wife had been close to calling the police. He was having difficulty finding a job since he had last been fired. He worked for Bank of America from 2006 to 2008 but became much more anxious after the bank was robbed, which led difficulty functioning. He indicated that they expected he would have a set of skills he did not actually have, and he was fired one month after the robbery occurred. He then got a job at Sprint in July 2008, but had a personality conflict with his supervisor. He had no hobbies or interests and reported no friends. He said he did not socialize or go out at all. He said he had family in Maryland, but did not stay in touch with them. He talked to his mother on occasion, but was not particularly close to her. The examiner noted he was socially isolated. He said he had completed an undergraduate degree at Claflin College and had been working on his master's in information technology at Webster University since 2008. In terms of symptoms, the Veteran reported feeling suicidal at times. He thought about suicide as recently as October 2009 because of his finances and difficulty finding a job. However, he indicated he would not do this because of his family. He also reported hearing voices at night that seemed to be calling him by name. He felt paranoid at times in the house, particularly in the middle of the night. He woke four times during the night and would have bad dreams every other day, on average. He also reported difficulty falling asleep, indicating it would take him about thirty minutes or more. Loud sounds and movement led him to overreact and lose his temper. When he did go out, he said he would be looking for somebody to say the wrong thing so he could start a fight. He also reported difficulty with concentration, noting that he had to record lectures in school in order to cope because he could not focus on what was being said at times. He also reported panic-like symptoms at times during work. He said he would become "very flustered, his heart would beat more rapidly, and he would start sweating." On mental status examination, he was well groomed and dressed, and had a pleasant and cooperative demeanor. Speech was normal in rate and rhythm, eye contact was appropriate, and thought content and processes were logical and goal-directed. His mood was somewhat depressed about his situation, and concentration was affected. The diagnosis was moderate to severe PTSD. The examiner noted that he had lost several jobs secondary to his symptoms and behavior.

On June 2010 VA examination, the Veteran said he rarely spoke with family members, as they had more or less drifted apart. He again said he was in the process of divorcing his second wife, with whom he had no children. He indicated they were divorcing due to his attitude since he came home from service, lack of communication, inability to be sociable, and drinking. He reported few social relationships, noting he talked with his son every two weeks or so. He also had few leisure pursuits besides watching television and working on cars occasionally. He denied any history of suicide attempts, but did note a history of violence or assault. Specifically, he said he broke someone's car window with a bottle in 2001 when he was having a fight over something the car owner had said. He was charged with malicious damage to property and was convicted and fined. He admitted a tendency towards road rage but had never been stopped by the police. He said his estranged wife complained about his drinking, which contributed to his divorce. He complained of nightmares "just about every night," with content related to his military service in Kuwait. He said he also checks the security in his house nightly when he wakes from nightmares. He also described difficulty falling asleep. On psychiatric examination, he was clean, neatly groomed, and casually dressed. Psychomotor activity was unremarkable and speech was normal. His attitude was cooperative, friendly, and relaxed. Mood was depressed with normal affect. The examiner noted the Veteran was easily distracted and could not perform serial seven tests. However, he could spell a word forwards and backwards. The Veteran was well oriented, and thoughts were unremarkable in process or content. He was free of delusions and understood the outcomes of his behavior, as well as the fact that he had a problem. The examiner noted no inappropriate behavior. The Veteran was able to interpret proverbs appropriately, but was noted to have obsessive and ritualistic behavior, insofar as he often went back to check whether he closed his garage door and found himself constantly disinfecting his hands. The examiner noted that these could just be adaptive behaviors, given his concerns about security and infection control. He did not describe being disturbed by the presence of such behaviors. He did not have panic attacks or suicidal or homicidal thoughts. Impulse control was felt to be fair. He was able to maintain minimum personal hygiene and had no problems with activities of daily living. The examiner noted that his alcohol use did not meet the criteria for a substance use disorder. Memory was mildly impaired in recent and remote functions, but immediate memory was normal. He reported lapses in detailed memory for events both earlier in his life and current needs. The examiner noted no psychiatric diagnosis other than PTSD, and said it caused occupational and social impairment with deficiencies in most areas, specifically including judgment (insofar as he reported episodes of assault and road range), family relations (insofar as his family relationships were affected by a lack of communication and frequent security checks during the night), and mood (insofar as he had depressed moods that influenced his level of energy ta work). 

On August 2010 VA examination, the Veteran said he lived with his cousin and was apparently quite isolated. He said he had no leisure pursuits. He denied any history of suicide attempts, violence, or assault. The examiner noted he had changed very little since the last June 2010 examination. On examination, he was clean and had unremarkable psychomotor activity and speech. He was friendly with normal affect and good mood. Attention was intact and he was well-oriented. Thoughts were unremarkable in process or content, and he reported no delusions. Sleep impairment was noted that interfered with job performance. He denied any hallucinations. The examiner noted no inappropriate behavior, homicidal thoughts, or suicidal thoughts. He interpreted proverbs appropriately and had no episodes of violence. He was able to maintain minimum personal hygiene. However, his recent and remote memory were both mildly impaired. The examiner noted his PTSD symptoms included recurrent and intrusive distressing recollections, distressing dreams, intense psychological distress at exposure to internal or external cues, physiological reactivity on exposure to cues, avoidance of thoughts, feelings, activities, places, people, or conversations associated with trauma, markedly diminished interest or participation in significant activities, feelings of detachment or estrangement from others, and restricted range of affect. He also noted difficulty falling or staying asleep, irritability or outbursts of anger, hypervigilance, and exaggerated startle response. The diagnosis was PTSD. The examiner did not provide an opinion regarding the occupational or social impairment resulting from PTSD, but noted that the Veteran was employed full-time as a VSO trainee and had lost less than one week of time due to medical appointments or occasional illness. 

In December 2010, the Veteran's wife submitted a statement noting that she has worked in clinical counseling for the military and in civilian contexts, and felt her husband had several negative behaviors that should be noted. Specifically, she said he was living by himself at the time and was isolating himself from family and friends. He did not interact with coworkers, and appeared in denial when she approached him about these behaviors. She said he "acts like everyone is 'out to get' him," and noted that he would take no responsibility in arguments with people, herself included, always viewing himself as the victim. She said he "honestly does not understand how his behaviors are inappropriate," despite having it explained to him. She also reported that he cannot remember names or time frames. For example, she said he cannot remember his teachers from grade school. In addition, she said he acted inappropriately with her adopted daughter when she was 20 but, when confronted about it, could not understand why it was inappropriate and only apologized for upsetting her. He rarely expressed any emotion other than sadness or loneliness, although he has two sisters and a mother that live approximately two hours away and always ask him to visit. She indicated that he did not know how to maintain relationships.

December 2010 VA records note the Veteran said he was divorced and lived in Philadelphia with his cousin and his son, daughter, and grand-daughter. He indicated his two sons still lived in South Carolina with his first wife, but that he would see them soon for a couple of days. He said he slept for three hours before noises would wake him. When he wakes, he said he "must get up and check the doors" before getting back to sleep in two hours. On the weekends, he said he could nap from 1pm to 4pm, but remained sleepy during the day. He reported increased anxiety around people that caused him to avoid big crowds. He also reported bouts of crying three times daily for the prior 10 years. He indicated he last felt suicidal about two months prior with a plan to take Elavil tablets because they cause him to have problems swallowing and breathing. January 2011 VA records show the Veteran had poor concentration, forgetfulness, difficulty making decision, slowed thinking, difficulty getting organized, inability to finish things, positive depression screen, fatigue, loss of energy, anxiety, irritability, poor frustration tolerance, and felt easily overwhelmed. On a separate evaluation, he was alert, cooperative, and oriented, and could recall two out of three words after one minute. Speech was fluent, clear, not pressured, and of normal volume. He exhibited "good expressive and receptive language skills." 

On January 2012 VA examination, the examiner diagnosed PTSD and alcohol abuse, and indicated that it is not possible to differentiate the symptoms or impairment that are attributable to each because his substance abuse appears to be secondary to PTSD symptoms, and represent his way of coping with the effects of his PTSD. The examiner opined that the Veteran's diagnoses caused occupational and social impairment with reduced reliability and productivity. He noted that the Veteran was living alone and had been divorced from his second wife for a year and a half. The Veteran said his wife sought divorce because of his attitude and his drinking. At the time, the Veteran was drinking daily, and continued to drink four to six drinks a night. He said he had been dating for about three months. His relationship with his two sons was "distant," and although his mother contacted him once a month, he denied any affirmative contact on his part. He was not close to his three siblings and denied having any friends in the area, though he did report one friend in Texas. The Veteran reported an increase in anxiety around people, and thus avoided crowds. He also said he experienced an increase in alcohol consumption and suicidal thoughts, but denied plans or intent at the time. The examiner noted symptoms included depressed mood, anxiety, suspiciousness, chronic sleep impairment, difficulty establishing and maintaining effective work and social relationships, inability to establish and maintain effective relationships, and suicidal ideation. 

A June 2013 statement from a friend attests to the Veteran's chronic anxiety, irritability, hypervigilance, and difficulties staying focused or remaining competent. It also indicates the writer often feared "he may be harmful to himself and others." June 2013 VA records show the Veteran reported poor sleep, nightmares four to six times a week, low energy and motivation, avoidance of crowds, hypervigilance, and a nighttime routine of checking doors, locks, and windows. He said he liked having his back against the wall. He denied any panic attacks or periods of time where he would have decreased need for sleep, increased energy, slated mood, grandiosity, spending sprees, impulsivity or hypersexuality, racing thoughts, rapid speech or hyperactivity, auditory or visual hallucinations, delusions, or suicidal or homicidal ideation. He did drink a bottle of alcohol a week, however, but indicated this did not interfere with his work. The provider noted he was awake and alert, well-groomed and pleasant, cooperative, and oriented to person, place, and time. Speech was normal with no circumstantiality or tangentiality. Mood was sad and irritable with decreased range and intensity of affect. Thoughts were logical and free from thought disorder, hallucination, or delusion. Cognitive function was intact (i.e., he was able to recall five of five words and spell the word "world" backwards). Insight and judgment were intact.

August 2013 VA records show the Veteran was contacted by telephone and said his mood remained "not good." He continued to report nightmares and poor sleep, but denied any suicidal or homicidal ideation. In a statement that month, he claimed he sometimes experienced disorientation and could not remember certain events or family members' names. This had caused more depression and made him "a social wreck." He also indicated that his PTSD had affected his thought process and communication skills. On September 2013 mental status examination, the Veteran was well groomed, awake, alert, and oriented. He maintained good hygiene and made good eye contact. There were no motor abnormalities noted, and his mood was "a little better" with neutral affect. Speech was fluent and spontaneous. Thoughts were logical and free from delusions, perceptual disturbances, hopelessness, or suicidal or homicidal ideation. Cognition was grossly intact and insight and judgment were average. An October 2013 statement from the Veteran's coworker indicates the Veteran had displayed grossly inappropriate behavior, drank a lot, and started fights. He also reportedly talked about suicide constantly. She said he does not keep contact with his family, and indicated she felt he was "going to snap" and hurt someone. The Veteran's relatives apparently contacted her constantly in search of him. She also noted that his mood and highly depressive state makes him want to be alone.

February 2014 VA records indicate the Veteran's mood was "in the middle." He continued to have poor sleep (about four hours a night). On bad days, he described passive thoughts of suicide without plan or intent, and last had such thoughts about a week prior. However, when specifically asked, he denied suicidal or homicidal ideation. He continued to have nightmares with no increase in intensity. He continued to isolate himself and drink (about three drinks per sitting, nearly every night, but not when he knows he has something to do the next day). He lived alone, but was in a relationship. On examination, he was well groomed and had good hygiene. He was awake, alert, and well oriented. No motor abnormalities were noted. He had a neutral affect with slightly decreased range, but speech was fluent and spontaneous. Thoughts were logical and free from thought disorders. He denied any delusions or perceptual disturbances, and did not feel hopeless. Cognition was grossly intact and insight and judgment were average. In May 2014, the Veteran reported a ten year history of insomnia with no clear precipitant. He said he went to bed at 11 P.M., but did not fall asleep until 1 A.M. He indicated he woke on his own around 5:30 A.M., so he only got about four and a half hours of sleep per night. He also reported having difficulty letting down his guard at night, as well as nightmares twice per week that interrupted sleep. He reported his mood had been "so-so" that month.

In August 2014, the Veteran was oriented to person, place, time, and situation on mental status examination. His mood was euthymic with congruent affect. However, he reported both suicidal and homicidal ideation. The provider noted his PTSD was causing "heightened arousal and nightmares" that were waking him at night. 

A December 2014 initial private psychological evaluation and examination report indicates a thorough review of the Veteran's record. It notes he had a history of two failed marriages, and was now living alone without any relationship involvement. He reported a suspiciousness of women and said he would rather "go it alone." He also maintained no relationship with his father, mother, or three siblings. He said he had a few friends who lived far away. In terms of current functioning, he reported chronic sleep problems and nightmares that left him sometimes waking anxiously and in a sweat. He also endorsed hypervigilance, intrusive thoughts, and dissociative flashbacks. He said he is suspicious of most others and was obsessive compulsive insofar as he hoarded things. Specifically, he indicated he had ten printers, five uniforms, canteens, a mess kit, and nuclear biological chemical kits. He said he could test the air, and was convinced these things were necessary for his survival. He was contemplating getting a security system. He said he associated with nobody at home or at work and sought anonymity. He had no fun, joy, or hobbies, and stayed in the safety of his home. Once in a while, he went for walks, but was paranoid on the road, and kept a close lookout for those that would follow him. He indicated he walks in erratic patterns at times to prevent being followed "by those who might." He did not cook, and only ate frozen meals or take out. His judgment was poor and his reasoning was idiosyncratic. He also complained of hearing voices, mainly at night, that called his name. At the time, he was working for VA, but was on leave under the Family Medical Leave Act. He also said he missed work frequently, about one week per month. At work, he also kept to himself. On mental status examination, he presented with flat affect with little modulation. His mood was sullen and low, and he appeared angry. The Veteran endorsed feeling depressed and having passive thoughts of suicide. He was also anxious and expressed fears, anticipation of doom, and expectations of bad things happening. As a result, he prepared for these eventualities and was "on guard and ready." The examiner noted he attempted to control his anxiety with obsessive compulsive thoughts and behavior (i.e., hoarding things that are required for survival). His judgment and reasoning were poor, and his thinking was constricted, bordering on paranoid. Impulse control was also questionable, and he said he "pisses people off." Symptoms of PTSD included depressed mood, anxiety, suspiciousness, panic attacks that occur weekly or less often, panic attacks that occur more than once a week, chronic sleep impairment, mild memory loss, impairment of short and long-term memory, flattened affect, circumstantial, circumlocutory, or stereotyped speech, intermittently obscure, illogical, or irrelevant speech, difficulty understanding complex commands, impaired judgment and abstract thinking, disturbances of motivation and mood, difficulty establishing and maintaining effective work and social relationship, difficulty adapting to stressful circumstances, inability to establish and maintain effective relationships, passive suicidal thoughts, obsessional rituals interfering with routine activities, persistent hallucinations, grossly inappropriate behavior, neglect of personal appearance and hygiene, and intermittent inability to perform activities of daily living. The examiner concluded that his PTSD caused occupational and social impairment with deficiencies in most areas. 

March 2015 VA records show the Veteran was casually attired, cooperative, and made good eye contact. He was alert, oriented, and had no abnormal movements. Speech was normal, mood was dysphoric, and affect was reactive. Thoughts were normal without hallucinations, delusions, or suicidal or homicidal ideation. Attention, concentration, and memory were intact. His fund of knowledge was adequate and insight and judgment were fair. In April 2015, the Veteran continued to have distressing dreams and occasional nightmares that cause him to wake in a panic. He said he had missed his last visit due to the death of his mother, and noted he was "not himself" on that day. He said he continued to have days when he is down, but his cousin was a good source of support. He also reported some late day fatigue at work that was most prominent when he had a large meal, but otherwise had no changes in appetite or energy. He denied suicidal or homicidal ideation, drug use, or hallucinations. On mental status examination, he was awake, alert, oriented, and spoke normally. He had a reactive affect with neutral mood. Thought processes were normal. He denied delusions. Attention, concentration, and memory were intact, and insight and judgment were fair. 

In September 2015, the Veteran was casually attired, made good eye contact, and was cooperative. He was alert, oriented, and had no abnormal movements or speech. Affect was reactive with anxious mood, but thoughts were normal. He denied suicidal or homicidal ideation. Attention, concentration, and memory were intact. Insight and judgment were fair. In October 2015, the Veteran was casually attired, cooperative, and made good eye contact. He was alert and oriented, and there was no abnormal motor activity noted. Speech was normal, mood was neutral, and affect was reactive. Thoughts were normal with no hallucinations, suicidal or homicidal ideation, or delusions. Attention, concentration, and memory were intact. The Veteran's fund of knowledge was adequate and insight and judgment were fair. The Veteran said his energy was "okay" and indicated he was enjoying working at VA in accounting. He said he was happy at work and doing well. However, he continued to get only five or six hours of sleep, and did not associate with people, staying mostly to himself. He denied any hopelessness. 

In February 2016, the Veteran was casually attired and made good eye contact. He was alert and oriented. There were no abnormal movements noted, and speech was normal. Affect was reactive with an anxious mood, but the Veteran had no thought abnormalities. He denied suicidal or homicidal ideation. Attention, concentration, and memory were intact. Insight and judgment were fair. April 2016 VA records note the Veteran continued to have nightmares, though they had decreased. He reported continued nighttime anxiety, intrusive thoughts, hypervigilance, and a compulsion to check and recheck his locks and windows so that he could "be prepared for the unexpected." He had poor sleep. He said he had low motivation but was less irritable at work. However, he continued to be isolating and avoidant. He denied hopelessness or anhedonia. On mental status examination, he was casually attired, looked younger than his stated age, and made good eye contact. He was also alert and oriented, with no abnormal motor activity. Speech was normal, though he had low volume and was soft-spoken. Mood was dysphoric and affect was reactive. Thoughts were normal, without hallucinations, delusions, or suicidal or homicidal ideation. Attention, concentration, and memory were intact. His fund of knowledge was adequate, and insight and judgment were fair.

On May 2016 VA examination, the examiner diagnosed PTSD and alcohol use disorder, but indicated it is not possible to differentiate the symptoms or impairment attributable to each because of the overlapping and interactive nature of the symptoms presented. In addition, he noted that alcohol abuse is secondary to PTSD symptoms, and represents the Veteran's attempt to cope with the effects of PTSD. The examiner also noted that the Veteran has depression, but found this was also secondary to, and part of, his PTSD symptoms. The Veteran's psychiatric symptoms were felt to cause occupational and social impairment with reduced reliability and productivity. The examiner noted that the Veteran was living alone and had not dated since his divorce. He had children from different relationships but had not had contact with them in several months. The Veteran's mother was deceased and he did not have contact with his three siblings because they did not get along. He also denied having any friends and described himself as a loner. When he is not working, he said he sits at home and watches war movies until he goes to bed at 2:30 A.M. He woke for work around 5:30 A.M. He had been working for VA at the Philadelphia Regional Office for the prior five years. For the prior six months, he had specifically been working as a financial specialist and said he got along with his new supervisor, which was a welcome change as he indicated he had to contact his Union to get him a new position to get away from his previous supervisor, who had written him up for poor performance. He also said he previously lost a lot of time from work because he would call out to avoid dealing with his old supervisor. Symptoms of PTSD noted on examination included depressed mood, anxiety, suspiciousness, chronic sleep impairment, flattened affect, disturbances of motivation and mood, difficulty in establishing and maintaining effective work and social relationships, and an inability to establish and maintain effective relationships. The examiner noted that the Veteran was neatly dressed, cooperative, and had fair eye contact. He denied suicidal or homicidal thoughts, plans, or intent. He was not considered suicidal or homicidal at the time, and conversation was logical, coherent, and goal-directed. His affect was variable and congruent to the conversation. Mood was fair, and there was no indication of psychotic manifestations or bizarre behaviors during the interview. Judgment and insight were both considered fair. The Veteran appeared to be stable and in adequate control. The examiner also indicated a review of the December 2014 private psychiatric evaluation, and indicated agreement with the ultimate diagnosis but disagreement with the severity reflected in that report. The examiner specifically felt that the Veteran's condition was not severe enough to have impeded his occupational functioning, particularly considering he had been able to work full time for the VA for over five years and had minimal mental health treatment. These factors lead "to the conclusion that the Veteran was able to cope successfully with his PTSD symptoms so that these did not greatly affect his industrial adaptability."

In June 2016, an updated private evaluation indicates the Veteran continued to experience chronic sleep problems, but had developed continuous depression that contributed to his excessive absence from work. It noted that he missed one week per month from his current job, and suffered high anxiety, noting anxiety attacks more than once a week. His judgment, abstract reasoning, and impulse control were all impaired, and his thinking was constricted. The examiner noted that he tends to misinterpret social data and responds to such misinterpretation as if it were true and defended it. The examiner felt this style of thinking had harmed both occupational and social functioning. In addition, his censoring ability was poor and led to suspensions from work and involuntary transfers. He also had no friends and associated with nobody at work. He lived alone and had severed his relationship with a girlfriend. He continued to have no fun, joy, or hobbies, and stayed in the safety of his home. Moreover, the examiner noted he continued to have intrusive thoughts, flashbacks, and memories. He also had a history of auditory hallucinations. The examiner noted that, although he was working at VA as a finance clerk and had worked there for five years, he had been a source of employee complaints and experienced social problems with both colleagues and supervisors. He had been suspended twice and transferred three times. He also indicated that he had applied for seven jobs over the years he had been working for VA, but was turned down on each occasion. He believed that this was the result of collusion to prevent his acceptance to another position, and that he was "tagged for not being a cooperative employee." He reported passive suicidal thoughts and worried that he may lose impulse control at work. He saw a psychiatrist once a month, but had no friends or support system.

A contemporaneous privately completed disability benefits questionnaire indicates the Veteran's PTSD and alcohol abuse disorder caused symptoms including continuous depressed mood, anxiety, suspiciousness, panic attacks that occur either weekly or less often or more than once a week, near-continuous panic or depression affecting his ability to function independently, appropriately, and effectively (noting he took one week a month off from work), chronic sleep impairment, mild memory loss for names, impairment of short and long-term memory (such as forgetting to complete tasks), flattened affect, difficulty in understanding complex commands, impaired judgment, impaired abstract thinking, disturbances of motivation and mood, difficulty establishing and maintaining effective work and social relationships, difficulty adapting to stressful circumstances, including work or a work-like setting, inability to establish and maintain effective relationships, suicidal ideation, obsessional rituals interfering with routine activities, impaired impulse control, such as unprovoked irritability with periods of violence, and grossly inappropriate behavior. The examiner further noted that the Veteran abhorred authority and supervisors, and could not maintain an effective relationship. These symptoms were felt to cause occupational and social impairment with deficiencies in most areas.

A November 2016 VA record shows the Veteran reported a sad and anxious mood, and continued to have poor sleep. He had persistent hypervigilance, intrusive thoughts and nightmares, low frustration tolerance and irritability, low motivation and isolation, mistrust of others, and feelings of being "on edge." He only slept for three or four hours a night. However, he denied any work-related issues, and said he was able to complete his work without issues, though he did feel irritable at times. He denied any anhedonia, suicidal or homicidal ideation, or change in appetite. On mental status examination, he was casually attired and made good eye contact. He was also alert and oriented, with no abnormal motor activity. Speech was normal and mood was dysphoric with a reactive affect. Thoughts were normal, without hallucinations or delusions. Attention, concentration, and memory were intact. His fund of knowledge was adequate, and insight and judgment were fair.

Analysis

At the outset, the Board acknowledges that there have been suggestions of other psychiatric conditions (most notably alcohol dependence and depression) during the remaining "staged" periods on appeal, but as the evidence indicates the symptoms and impairment from such conditions are indistinguishable from those due to service-connected PTSD, the Board will consider the totality of the Veteran's psychiatric disability picture. See Mittleider, 11 Vet. App. at 182. 

Based on the evidence above, the Board finds that the Veteran's PTSD has produced symptoms warranting a higher 70 percent rating from July 2, 2007. In so finding, the Board first notes that the evidence quite clearly shows a consistent history of troubled marital and family relationships, lack of socialization, and significant and recurrent difficulties at work. Moreover, the Veteran has also consistently reported and been observed with disturbances of mood-namely depression and anxiety-which have even been specifically described as near-continuous at times. He has also been repeatedly characterized, by himself and others, as irritable and has even endorsed episodes of inexplicable violence against his family. There is also a long, well-documented history of memory impairment, including of fairly significant details such as peoples' names, recent events, and things his wife has characterized as "unforgettable." Clinical testing has shown a history of difficulty recalling words during cognitive testing or naming the current or most recent Presidents, as well as difficulties with spelling words. There is also clearly evidence that the Veteran has had a history of recurrent impairment in judgment, perhaps most starkly demonstrated by his wife's report that he discussed inappropriate topics with her 20-year-old daughter and appeared unable to understand why she was upset about it. Moreover, recent private psychiatric evaluations specifically indicate that he acts upon and defends misinterpretations of situations. In light of the above, it is quite clear that the Veteran's PTSD has clearly caused deficiencies in mood, thinking, judgment, family relations, and work. Moreover, when the Veteran was taking classes in pursuit of a degree, he also reported his cognitive difficulties (specifically with concentration) interfered with his ability to pay attention in class, and that he was forced to record all lectures; thus, he clearly also suffered deficiencies at school. Notably, the record includes multiple psychiatric evaluations (from VA and psychiatric providers) that explicitly found occupational and social impairment with deficiencies in most areas. Consequently, there is no question that impairment consistent with a 70 percent rating has been shown during the remaining periods on appeal-what remains to be determined is when the record first reflects such impairment. 

To that end, the June 2007 VA examination report notes irritability and social withdrawal, a "less than felicitous domestic life" that included a "shaky" marital relationship and no communication with immediate family members, no socialization outside attending church, no leisure pursuits, and increased depression. Just one month later, in a July 2, 2007 statement, the Veteran's wife added that he had developed panic attacks at night and confirmed long-standing depression, inability to communicate at times with family members, flattened mood, and constant argumentativeness. Notably, she also indicated that he had nearly been fired because he simply had no desire to go to work. That statement, particularly when compared to the June 2007 examination report, readily demonstrates that the Veteran already began to experience deficiencies in work, family relations, and mood. These represent deficiencies in three of six areas of functioning contemplated by the 70 percent rating criteria and, as the Veteran was not in school, constitute a majority of the applicable areas at the time. Moreover, the Board also finds the fact that he acted upon his aversion to working to the extent that he was nearly fired indicates he was unable to properly weigh the consequences of his actions. In other words, he certainly seems to have demonstrated impaired judgment, even if judgment was not wholly absent in that particular instance (as he was only nearly fired). Notably, shortly thereafter, the evidence shows the Veteran's symptoms worsened, developing memory impairment in January 2008. By October 2008, it is clear the Veteran had demonstrable problems at work, cognitive deficits, detachment from his family, flattened affect, impaired insight and judgment, and impaired orientation. As such, the Board finds the July 2, 2007 statement is the first documented evidence indicating the Veteran's PTSD began causing deficiencies in most areas of functioning. Therefore, a 70 percent rating is warranted from that date.

In light of the above, the Veteran's PTSD is rated 30 percent from September 26, 2006 and 70 percent from July 2, 2007. Consequently, the Board must also considered whether there is evidence that the Veteran's PTSD produced symptoms or impairment consistent with ratings in excess of 30 percent at any time prior to July 2, 2007. The only pertinent evidence to this question (the September 2006 VA examination report, a May 2007 VA treatment record, and the June 2007 VA examination report) certainly reflects disturbances in mood (i.e., depression) and difficulties with social and work relationships (i.e., irritability that manifested towards customers at work, inability to communicate with family members, and lack of socialization), but does not indicate symptoms of a frequency, severity, or duration consistent with a 50 percent rating. Specifically, the criteria for such rating indicate that there must be some degree of sustained reduction of reliability and productivity beyond the "occasional" and "intermittent" episodes required for a lower 30 percent rating. Moreover, the types of symptoms contemplated in the 50 percent rating criteria imply the requirement of some degree of cognitive or communicative dysfunction (e.g., abnormal speech, difficulty with complex commands, short and long-term memory impairment, impaired judgment, or impaired abstract thinking). Here, the September 2006 VA examiner specifically found "good cognitive skills" and the June 2007 VA examiner found no impairment of memory, thought processes, communication, or cognition. Moreover, there is no evidence of impaired abstract thinking prior to July 2, 2007. Therefore, a 50 percent rating is not warranted at any time prior to that date.

Similarly, there is also no evidence that the Veteran suffered from deficiencies in most areas at any time prior to July 2, 2007. At most, the evidence suggests deficiencies in mood and family relations during this period. In so finding, the Board acknowledges that the June 2007 examination report also indicates the Veteran reported irritability at work and had lost time from work due to PTSD about ten times in the prior three months. However, absent clarification as to the degree or duration of such loss, this finding does not speak to the severity of any resultant impact on his work. Therefore, particularly considering the criteria for a 70 percent rating clearly contemplate relatively severe deficiencies in the noted areas of functioning, the Board cannot find that the mere fact that time was lost (which could be as insignificant as 10 hours in three months or as debilitating as 10 weeks in three months), alone, cannot be sufficient to satisfy the rating criteria for a 70 percent rating. In contrast, the July 2, 2007 statement upon which the Board has granted a higher 70 percent rating above specifically indicates that the Veteran had avoided going to work so frequently or for so long that he risked termination; there is no equivalent indication in the record at any time prior to July 2, 2007. Therefore, a 70 percent rating is also not warranted prior to such date.

Thus, the only remaining question is whether a rating in excess of 70 percent is warranted at any time during the periods on appeal. However, at no point during any periods under consideration is the Veteran's PTSD shown to cause symptoms resulting in total occupational and social impairment. In so finding, the Board acknowledges that the Veteran's condition did, as indicated in the immediately preceding analysis, indeed deteriorate and that more severe symptoms have been reported (including auditory hallucinations, obsessive behavior, more frequent suicidal thoughts, reports of grossly inappropriate behavior at work, episodes of disorientation, continuous panic or depression). However, there is simply no evidence or other indication that he had, at any point, become totally impaired. In fact, the most recent medical evidence indicates that, despite missing significant amounts of time, the Veteran continued to work as a finance clerk. Furthermore, none of the medical opinions in the record found the Veteran suffered from total occupational and social impairment. Even his private psychiatric evaluations, which arguably present the most pessimistic view of his condition, specifically found his occupational and social functioning fell short of total impairment. Moreover, VA records suggest he has always been readily able to describe his condition, and there is no indication that he was simply unable to function in both social and work settings at any time during the periods on appeal. In November 2016, just after the rather dire report from his private psychiatrist, he even specifically told VA providers that he felt irritable at times but was able to complete his work without issues. Thus, notwithstanding the notations or reports of some more striking symptoms, there is nothing suggesting his disability is primarily or predominantly characterized by grossly severe or near-constant symptoms that render him totally impaired. Consequently, the preponderance of the evidence is against finding the Veteran's PTSD has produced total occupational and social impairment, and a higher-still (100 percent) rating is not warranted at any time during the periods on appeal.

Extraschedular Considerations

The Board has also considered whether the Veteran is entitled to a greater level of compensation on an extraschedular basis for the above disabilities. An extraschedular disability rating is warranted based upon a finding that the case presents such an exceptional or unusual disability picture as to render impractical the application of the regular schedular standards. 38 C.F.R. § 3.321(b)(1); see Fanning v. Brown, 4 Vet. App. 225, 229 (1993); see also Thun v. Peake, 22 Vet. App. 111, 116 (2008), aff'd sub nom. Thun v. Shinseki, 572 F.3d 1366 (Fed. Cir. 2009) (establishing a three-step inquiry for extraschedular referral).

In this case, the Veteran's PTSD is manifested by symptoms such as depression, anxiety, suicidal ideation, cognitive difficulties, irritability, inappropriate behavior, sleep impairment, difficulty adapting to stressful circumstances, memory impairment, impaired judgment, insight, and thinking, disorientation, panic attacks, and some obsessional behavior with attendant occupational and social impairment. Therefore, the Board finds that the associated symptoms and degree of disabilities shown are entirely, and rather specifically, contemplated by the rating schedule and, therefore, referral for extraschedular consideration is not warranted. See Thun, 22 Vet. App. at 116.

The Board has considered whether the Veteran or the evidence have reasonably raised the matter of entitlement to a total disability rating based on individual nemployability due to his service-connected PTSD. However, despite suggestions at times during the periods on appeal that he could not hold down a job or maintain steady employment due to his symptoms, the record indicates that he has been fairly consistently employed and he has not alleged, nor has the evidence otherwise suggested, that his PTSD has rendered him unable to obtain or follow substantially gainful employment. Notably, as discussed above, the most recent evidence suggests that he continues to be employed and is able to complete his work without issues. Therefore, the Board finds that a TDIU claim has not been raised by the record pursuant to Rice v. Shinseki, 22 Vet. App. 447, 455 (2009).

Accordingly, in summary, to the extent that the evidence is at least in relative equipoise as to whether a 30 percent rating is warranted from September 26, 2006 and whether a 70 percent rating is warranted from July 2, 2007, the Board resolves any remaining reasonable doubt in the Veteran's favor and the appeal must be granted. However, to the extent that the preponderance of the evidence is against finding that a rating in excess of 30 percent is warranted prior to July 2, 2007, or that a rating in excess of 70 percent is warranted at any time under consideration, the benefit of the doubt rule does not apply and the appeal must be denied.


ORDER

The claim of service connection for a right wrist disability is reopened.

A 30 percent rating (but not higher) is granted from September 26, 2006.

A 70 percent rating (but not higher) is granted from July 2, 2007.


REMAND

A review of the evidence shows the Veteran has never been examined in conjunction with a claim of service connection for a right hand, thumb, or wrist disability. However, as noted in the analysis above, the evidence clearly suggests that he has a current right wrist, hand, or thumb disability and his STRs (and prior VA decisions) confirm that he injured the relevant area in service. As such, a VA examination is needed to determine the nature and likely cause of his claimed disability.

Accordingly, the case is REMANDED for the following action:

1. Obtain all updated records of VA or adequately identified private treatment the Veteran has received for a right wrist, hand, or thumb disability.

2. Then, arrange for the Veteran to be examined by an orthopedist to determine the nature and likely cause of his claimed right wrist, hand, or thumb disability. Based on an examination, review of the record, and any tests or studies deemed necessary (including X-rays or other imaging), the examiner should provide responses to the following:

a. Please identify, by diagnosis, each right wrist, hand, or thumb disability entity found. The examiner should reconcile all diagnostic findings with conflicting evidence in the record.

b. For each right wrist, hand, or thumb disability entity diagnosed, please opine whether it is at least as likely as not (a 50 percent or better probability) that such disability is related to service, to include notations of a right hand or thumb sprain therein.

A detailed explanation (rationale) is requested for all opinions provided. (By law, the Board is not permitted to rely on any conclusion that is not supported by a thorough explanation. Providing an opinion or conclusion without a thorough explanation will delay processing of the claim and may also result in a clarification being requested).

3. The AOJ should then review the record and readjudicate the claim. If it remains denied, the AOJ should issue an appropriate supplemental statement of the case, afford the Veteran and his representative opportunity to respond, and return the record to the Board.

 



The appellant has the right to submit additional evidence and argument on the matter the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).




______________________________________________
VICTORIA MOSHIASHWILI
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs